# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

THOMAS BRAND,

     Plaintiff

v.

GREG COX, et. al.,

     Defendants

Case No.: 3:17-cv-00043-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 151

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 151, errata at 152-1, 152-2, manually filed DVD.) Plaintiff filed a response (ECF No. 163) and was allowed to file a supplemental response (ECF No. 169). Defendants filed a reply. (ECF No. 170.)

After a thorough review, it is recommended that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (First Amended Complaint (FAC), ECF No. 107.) The events giving rise to this action occurred while Plaintiff was housed at Northern Nevada Correctional Center (NNCC). Defendants are: Ronald Mullins, Greg Cox, E.K. McDaniel, Sheryl Foster, Isidro Baca, Lisa Walsh, Dillyn Keith, Tara Carpenter, and Shannon Moyle.

On screening the FAC, the court allowed Plaintiff to proceed with an Eighth Amendment failure to protect claim against defendant Ronald Mullins, based on allegations that on January 10, 2015, Mullins watched a confrontation between Plaintiff and another inmate in the culinary, and closed the staff office door, and failed to intervene. As a result, Plaintiff received physical injuries requiring medical attention. Plaintiff further alleges that Mullins incited the attack by labeling Plaintiff a snitch.

In addition, Plaintiff was allowed to proceed with an Eighth Amendment claim against defendants Cox, McDaniel, Foster, Baca and Walsh, based on allegations that they knew of previous events and threats occurring in the culinary through complaints (including Plaintiff's own complaints), grievances, tape recordings, kites, and incident reports, but failed to adequately staff the culinary with correctional officers to effectively supervise the area, or take other steps to prevent the violence from occurring.

Next, Plaintiff was allowed to proceed with a claim against defendants Keith, Carpenter, and Moyle for violation of his First Amendment right to seek redress of grievances. Defendant Rexwinkel was named in this claim, but has since been dismissed. (*See* ECF No. 76, report and recommendation adopted at ECF No. 106.) Plaintiff alleges that they denied Plaintiff the right to file a disciplinary appeal by giving him the wrong forms, dismissing the appeal as improper, and failing to properly process the appeal.

Finally, Plaintiff was allowed to proceed with a retaliation claim against Keith based on allegations that Keith threatened Plaintiff that if he continued to file complaints and grievances, he would be kept in the "hole" longer and transferred, thereby losing his opportunity to complete his re-entry program. He was also told the parole board would not look favorably on his filing

1  grievances and complaints. Rexwinkel was also named as a defendant in this claim, but she has

2  been dismissed.

3      Defendants move for summary judgment, arguing: (1) Mullins was not deliberately

4  indifferent to Plaintiff's safety; (2) Cox, McDaniel, Foster, Baca and Walsh did not personally

5  participate in any alleged constitutional violation; (3) Plaintiff has not alleged or proven actual

6  injury in order to prevail on his First Amendment right to redress of grievances claim;

7  (4) Plaintiff was not transferred for a retaliatory purpose, but for a legitimate correctional reason;

8  and (5) Defendants are entitled to qualified immunity.

9  **II. LEGAL STANDARD**

10      The legal standard governing this motion is well settled: a party is entitled to summary

11  judgment when "the movant shows that there is no genuine issue as to any material fact and the

12  movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

13  *v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the

14  evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*

15  *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

16  of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary

17  judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the

18  other hand, where reasonable minds could differ on the material facts at issue, summary

19  judgment is not appropriate. *Anderson*, 477 U.S. at 250.

20      "The purpose of summary judgment is to avoid unnecessary trials when there is no

21  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

22  F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose

23  of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477

U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

## III. DISCUSSION

### A. Failure to Protect-Mullins

#### 1. Standard

Under the Eighth Amendment, prison conditions should not "involve the wanton and unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison conditions may be, and often are, restrictive and harsh, prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)(quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)).

"[P]rison officials have a duty...to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citations and quotations omitted); *see also Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir.2015) (citing *Farmer*, 511 U.S. at 833). "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to

outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833  (internal citations omitted).  "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 834 (citing *Rhodes*, 452 U.S. at 347).

To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. *Farmer*, 511 U.S. at 834; *see also Labatad v. Corrections Corp. of America*, 714F.3d 1155, 1160 (9th Cir. 2013) (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)). Under the deliberate indifference standard, a violation of the Eighth Amendment is only found when an objective and subjective component are met.  *See Farmer*, 511 U.S. at 834; *Labatad*,  714F.3d at 1160.

First, "the deprivation alleged must be, objectively, sufficiently serious...; a prison official's act or omission must result in the denial of 'the minimal civilized measures of life's necessities.'" *Farmer*, 511 U.S. at 834  (citations and quotations omitted).  When a plaintiff claims prison officials failed to take reasonable steps to protect, the plaintiff must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.*  (citations omitted).

Second, the inmate must satisfy the subjective element. This means that the prison official must "know of and disregard an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S.  at 837.  "Mere negligence is not sufficient to establish liability." *Frost v.  Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). "Liability may only follow if a prison official 'knows that inmates face a substantial risk

1  of serious harm and disregard that risk by failing to take reasonable measures to abate it.'"

2  *Labatad*, 714 F.3d at 1160 (quoting *Farmer*, 511 U.S. at 847).

3       "A prison official's deliberate indifference may be established through an 'inference from

4  circumstantial evidence' or "from the very fact that the risk was obvious.'" *Cortez*, 776 F.3d at

5  1050 (citing *Farmer*, 511 U.S. at 842); *Harrington v. Scribner*, 785 F.3d 1299, 1304 (9th Cir.

6  2015) (citing *Farmer*, 511 U.S. at 841-42). "[O]bviousness of a risk may be used to prove

7  subjective knowledge, [but] liability may [not] be based on constructive knowledge." *Id*. (Citing

8  *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013) (requiring a plaintiff

9  to demonstrate "that the risk was obvious or provide other circumstantial or direct evidence that

10 the prison officials were aware of the substantial risk' to defeat summary judgment).

11 "[O]bviousness is not measured by what is obvious to a layman, but rather what would be

12 obvious 'in light of reason and the basic general knowledge that a prison official may be

13 presumed to have obtained regarding the type of deprivation involved.'" *LeMire*, 726 F.3d at

14 1078 (citing *Thomas*, 611 F.3d at 1151).

15      Thus, prison officials may avoid liability by: (1) proving they were unaware of the risk,

16 or (2) proving they "responded reasonably to the risk, even if the harm ultimately was not

17 averted." *Farmer*, 511 U.S. at 844-45.

18      **2. Analysis**

19      According to Defendants, Plaintiff was involved in an incident in the culinary on January

20 10, 2015, where he struck another inmate in the face with a kitchen implement, and he and the

21 other inmate engaged in mutual combat and threats. (ECF No. 151-1.) Plaintiff was charged and

22 found guilty of assault, and on March 31, 2015, he was given nine months in disciplinary

23 segregation. (ECF Nos. 151-1, 151-4.)

Mullins argues that Plaintiff does not set forth sufficient facts to assert a deliberate indifference claim against him. In addition, he asserts that Plaintiff alleges that Mullins ignored threats made by another inmate, but does not show that Mullins was aware of these alleged warnings.

Mullins states in his declaration that on January 10, 2015, he was serving as the culinary officer, but was not aware of any incident until he exited his office to conduct an inmate count, and found an inmate bleeding from the upper portion of his nose. He did not hear yelling or fighting. He asked what happened, and the inmate said he had fallen. Mullins called for medical attention. He was then advised via institutional radio that an altercation had taken place, and that Plaintiff was to be restrained. He subsequently viewed the video evidence, which he says shows Plaintiff striking the other inmate with a vegetable peeler. Mullins states that he was never made aware of threats to Plaintiff, and did not ignore any warnings of a physical attack. He did not watch the confrontation, either visibly or via recording as it occurred. He never organized or bet or any inmate fight, and he never labeled Plaintiff as a "snitch." In addition, Plaintiff never indicated that he had an issue with any other inmate in culinary on or before the date of the incident. Mullins further states that he can see much of the culinary through the windows in his office, but certain areas are periodically blocked by racks and other kitchen equipment. (Mullins Decl., ECF No. 151-8.)

The notice of charges form from the incident corroborates Mullins' declaration. It states that Mullins exited the culinary office to conduct count at approximately 4:45, and during this time he observed the other inmate involved in the altercation, Gray, bleeding from the upper portion of his nose. (ECF No. 163-1 at 35-36.)

Plaintiff argues that prior to the altercation on January 10, 2015, prison staff knew of multiple inmate-on-inmate attacks, and they ignored the risk of harm and threat of injury to inmates by understaffing the culinary as there was only one officer posted in the culinary that day.

Plaintiff also argues that there was loud shouting between Plaintiff and the other inmate, Kevin Gray, prior to the altercation, between 4:53:26 and 4:55:16. He also asserts that the video footage of the incident shows the culinary office door being closed at 4:53:38, and he contends that Mullins was distracted with "free staff" inside the office, and Mullins stayed in his office while there was loud shouting of violent threats directed at Plaintiff within feet of the office while the door was open. Plaintiff asserts that the video footage of the threats occurred prior to 4:53:26 and was not included in the video footage produced by Defendants. Plaintiff maintains that Mullins looked through the window and observed the threats, and that Plaintiff observed Mullins watching the altercation on the video monitor. In his affidavit, Plaintiff says that Mullins made eye contact with him and turned away after the shouting started, closed the office door, and got on the phone. (ECF No. 163-1 at 16.) He further contends that Mullins later came to him and said, "I didn't think you had it in you fat boy, good job." (*Id*. at 17.)

Plaintiff also provides a declaration from inmate Kyle Bates. Bates was assigned to work in the culinary on the day of the altercation. He heard Gray become angry with Plaintiff over pizza, and then Gray shouted threats that he was going to knock Plaintiff out. Bates says that the argument lasted for ten minutes before the physical altercation. Bates claims that he went to the culinary staff office and requested serving utensils for the food carts from Mullins while the door was open. He told Mullins there was a serious problem between two inmates that needed Mullins' attention. Mullins responded, "I hear them, you need to mind your own business." Then,

a "free staff" cook entered the office and complained about the shouting, stating: "they're yelling out there, here we go." Mullins then closed the door and talked to the "free staff." Bates waited near the office door to get the serving utensils while watching Mullins and the "free staff" look at the computer monitor. Then, Bates heard someone yell, "now!" Bates heard Gray shouting threats at Plaintiff, approach Plaintiff, and then the physical altercation began. Bates looked back and forth from the altercation and the office and saw Mullins look out the window to make a phone call. Mullins then opened the door the office and yelled, "Count Time!" The inmates lined up for count. (Bates Decl., ECF No. 169 at 9-10.)

In another declaration from Bates, he states that while Gray was yelling at Plaintiff and chasing him around, Mullins was hiding in the staff office with the door shut and locked. (ECF No. 163 at 231.)

Plaintiff also submits a declaration of inmate Carlos Gurry, who states that on January 10, 2015, he was at his work assignment in the culinary, when he heard loud shouting coming from two inmates, who he observed to look like they were going to fight. Gurry looked at the office where Mullins was stationed, and Mullins was looking at the two inmates arguing and Mullins did nothing to stop the fight. Instead, he went back to the office and closed the door, picked up the phone and turned away. Gurry then saw Mullins in the office and he looked at the two inmates and then watched the television, ignoring the fight. Gurry subsequently heard Plaintiff ask the officer why he did not break up the arguing, and Mullins told Plaintiff: "Sometimes I bet on who will win- and I have it recorded, good job." (Gurry Decl., ECF No. 107-1 at 10-11; ECF No. 163 at 237.)

Plaintiff provides a declaration of inmate Alexander King, who states that he heard inmate Gray say: "the cop that was working that day told me to come after you. He said you told

on me." Gray also said that he had only threatened and gone after Plaintiff to provoke Brand to fight. (ECF No. 163-2 at 57.) In his own affidavit, Plaintiff also attributes the same statement to Gray. (ECF No. 163-1 at 251.) There is evidence in the record that Gray died.  (ECF No. 167-1.) Under Federal Rule of Evidence  804(a)(4), a declarant is unavailable as a witness if he is dead; however, none of the applicable exceptions to the hearsay rule for unavailable witnesses under Rule 804(b) appear to apply. Therefore, the statement is not admissible.

There are photos of the culinary at NNCC which also depict the staff office. (ECF No. 167-2.)

In their reply brief, Defendants' only argument is that Bates' declaration is not supported by the video evidence as the video does not show Bates near the door to the culinary office as Bates suggests. They also assert that it does not show a "free cook" entering the office before or during the altercation. In addition, they maintain that the office door remains open during the time depicted on the video. They argue that Bates' declaration is not credible, and the court should not rely on a version of events utterly discredited by an uncontested video, citing *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The video shows a man, whom the court presumes is Plaintiff, washing dishes in the culinary area when another inmate, presumably Gray, approaches Plaintiff. There is no audio on the video so the court cannot discern whether there is yelling or what the inmates are saying, but it is apparent that the two inmates are involved in a verbal confrontation. The two inmates are not engaged in the verbal confrontation long, likely less than a minute, before Plaintiff lunges to grab a kitchen implement and then strikes Gray with it in the face. The physical confrontation continues for a few minutes. It appears that the office is just on the other side of the room from where the inmates are fighting and that the door is open. There is no real view into the office on

the video, so it is not clear who is in the office, or whether they can see the altercation from the office window. There are several other people present in the culinary during the altercation, and some of them keep going about their culinary duties. One person, who is in close proximity to the altercation, does calmly walk toward the office, but does not appear to go into the office. The altercation ends and the inmates give each other a high five. Minutes later a correctional officer enters from a hallway and appears to talk to inmate Gray.

Preliminarily, Plaintiff provides no evidence that Mullins knew of any prior incidents in the culinary. Plaintiff, however, still raises a genuine dispute of material fact regarding whether Mullins heard or saw the altercation between Plaintiff and Gray and then failed to intervene. Even if the court were to disregard the Bates declaration because of discrepancies between the video and the declaration, there remains a genuine dispute of material fact as to whether Mullins knew of and disregarded a risk to Plaintiff's safety in the culinary on January 10, 2015. Plaintiff's own affidavits, as well as the affidavit of inmate Gurry (to which Defendants presented no argument), indicate that there was yelling in close proximity to the culinary office door where Mullins was located, and that Mullins actually saw the altercation at various points but failed to intervene. While Defendants rely on the video as definitive evidence of what occurred, the video leaves more questions unanswered than answered for the court. For example, it is unclear who was in the office; whether there was yelling before the video footage starts; whether the inmates were yelling in the minute preceding the altercation and during the altercation, and if so, how loud the yelling was; whether a person sitting in the office could hear the yelling; who the person was seen going toward the office; whether the person who moved toward the office said anything to whomever may have been in the office; whether a person located in the office could see the altercation from the window and whether the person did in fact see the altercation.

In light of the genuine dispute of material facts regarding what Mullins may have known about during the altercation in the culinary, the motion for summary judgment should be denied with respect to the Eighth Amendment failure to protect claim against Mullins.

**B. Personal Participation-Cox, McDaniel, Foster, Baca and Walsh**

**1. Standard**

When an official is sued under section 1983, the inmate "must show that each defendant personally played a role in violating the Constitution." *Hines v. Youseff,* 914 F.3d 1218, 1228 (9th Cir. 2019), *cert. denied,* 140 S.Ct. 159 (Oct. 7, 2019) (citing *Menotti v. City of Seattle,* 409 F.3d 1113, 1149 (9th Cir. 2005); *Taylor v. List,* 880 F.3d 1040, 1045 (9th Cir. 1989)). "An official is liable under § 1983 only if 'culpable action, or inaction, is directly attributed to them.'" *Id.* (quoting *Starr v. Baca,* 652 F.3d 1202, 1205 (9th Cir. 2011).

In addition, "[u]nder section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability.'" *Snow v. McDaniel*, 681 F.3d 978, 989 (9th Cir. 2012) (en banc) (quoting *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989)).

"A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is 'a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Snow,* 681 F.3d at 989 (quoting *Hansen*, 885 F.2d at 646).

The causal connection can include: " 1) [the supervisor's] own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) conduct that showed a reckless or callous indifference to the rights of others." *Lemire v. Cal. Dep't of Corr.*, 726 F.3d 1062, 1085 (9th Cir. 2013) (citations and internal quotation marks omitted). "The requisite causal connection can be

established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or should have known would cause others to inflict a constitutional injury." *Id.* (citing *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 2101 (Apr. 30, 2012)) (internal quotation marks omitted).

To hold these defendants liable for failure to protect under the Eighth Amendment, Plaintiff must establish a sufficient causal connection between their conduct and the constitutional violation—the asserted failure to protect him from harm inflicted by another inmate.

### 2. Analysis

Plaintiff seeks to hold Cox, McDaniel, Foster, Baca and Walsh liable on the basis that they knew of violent events among inmates occurring in the culinary, creating a heightened risk of harm to inmates in the culinary, and they failed to act to remedy this situation because the culinary was understaffed. He also asserts that there was a practice in place of guards inciting inmate-on-inmate violence and betting on such fights, which he describes as a "fight-club" or "gladiator" type scenario.

Baca states in his declaration that he is not aware of any significant issues with safety in NNCC's culinary department. He reviewed NNCC's records and only found three reported incidents of inmate fighting during calendar year 2014. He was never made aware of any specific or general threat to Plaintiff's safety prior to the incident. He does not believe staffing levels affected Plaintiff's assault on a fellow inmate. He was never aware of Plaintiff's allegation that there were fights staged by NDOC employees. He has investigated this and there is no evidence to support this allegation. (Baca Decl., ECF No. 151-12.)

Plaintiff submits the shift roster with culinary post positions that he relies on to support his position that Mullins was the only officer posted at the culinary that day, but the roster appears to have officers posted in the culinary tower, and then culinary 1 and culinary 2 on January 10, 2015. (ECF No. 163 at 48.) Therefore, this is not evidence that Mullins was the only guard on duty that day. Even if Mullins was the only guard in the culinary that day, the video reveals only a few people (it is unclear whether they are inmates or "free staff") in the culinary when the altercation took place, suggesting that having only one officer present may have been sufficient. Plaintiff does not demonstrate that the culinary was understaffed, or that the number of staff assigned to the culinary that day resulted in his injuries.

To support his argument that the defendants knew of a history of inmate-on-inmate violence in the culinary, Plaintiff asserts that he informed Ms. Fence, Ms. Smith, and Ms. Moses about this issue. Specifically, he states that he went to Ms. Fence's office on November 10, 2014, and she listened to his concerns regarding many assaults that had taken place in the culinary at NNCC, and that he thought the officers were betting on these fights. He asserts that Ms. Fence told him this was a custody issue and he should speak to Ms. Smith. On November 20, 2014, he spoke to Ms. Smith, who listened to his concerns about the culinary at NNCC, telling her the same things he had told Ms. Fence. Ms. Smith told Plaintiff that she spoke with Warden Lisa Walsh about this and Walsh said she would look into it, and in the meantime he should speak to the unit caseworker, Ms. Moses. He saw Ms. Moses in December, and she listened to his concerns about the culinary. She said she would notify culinary and keep an eye on this. (Brand Affidavits, ECF No. 163 at 215, 221, 227,  ECF No. 163-1 at 14-16.)

This is evidence that Plaintiff discussed the issue of inmate violence in the culinary with Ms. Fence, Ms. Smith and Ms. Moses. The only evidence that connects those meetings to any

1 Defendant is Plaintiff's statement that Ms. Smith told him that she conveyed his concerns to Ms.

2 Walsh and she said she would look into it. Ms. Smith's statement is inadmissible hearsay.

3       Plaintiff also provides a declaration from inmate Abraham Cruzado. Cruzado states that

4 from June 2014 to January 1, 2015, he was assigned to work in the NNCC culinary. He states

5 that several incidents occurred in the culinary: (1) involved two black prisoners fighting in the

6 bakery and one kicked the other repeatedly in the head; (2) a prisoner threw scalding hot water

7 on another prisoner's face and beat him to near unconsciousness in the clipper room; and (3) a

8 prisoner slammed another prisoner's face through and into a window in the bathroom. He states

9 that he felt unsafe and there were inmate rumors that culinary staff may be provoking such

10 incidents. (Cruzado Decl., ECF No. 163-2 at 83.)

11       It is not clear whether Mr. Cruzado personally observed these incidents. In addition, his

12 statements provide no evidence regarding the knowledge of these incidents by *these Defendants*.

13       Plaintiff provides an NDOC Investigation Detail Report for an incident that took place on

14 November 17, 2014, where inmates were involved in a physical altercation in the inmate

15 bathroom in the culinary. The document indicates that Warden Baca was notified of the incident.

16 (ECF No. 163 at 40.)

17       There is also an Investigation Detail Report for an occurrence on February 24, 2015

18 (which is after the January 10, 2015 incident at issue in this case), which states that during the

19 breakfast feeding an inmate assaulted another inmate in the culinary. (ECF No. 163 at 41.)

20       Finally, there is an Investigation Detail Report for an occurrence date of December 16,

21 2015, (again, this is after the January 2015 incident at issue here), which reported a fight in the

22 dining facility between two inmates. (ECF No. 163 at 42.)

23

The later two incidents took place *after* the incident Plaintiff was involved in the culinary on January 10, 2015; and do not serve to have put these Defendants on notice of inmate-on-inmate violence in the culinary before the incident Plaintiff was involved in on January 10, 2015. Therefore, there is a record of one incident, in November of 2014, which does indicate that Baca was notified. The occurrence of a single incident does not put Baca on notice of the prevalence of inmate-on-inmate violence in the culinary that would place Plaintiff at a heightened risk of being the victim of such violence, as Plaintiff suggests. In other words, the connection between Baca being notified of a single incident in November of 2014, and the harm that Plaintiff claims ultimately befell him in January of 2015, is simply too tenuous. Moreover, this does not impute any knowledge to any of the other defendants named in this claim.

There is no other evidence that creates a sufficient causal connection to establish that these Defendants knew of and disregarded a risk to Plaintiff's safety. Nor is there any evidence that any of these Defendants knew that correctional officers were purportedly inciting such violence and pitting inmates against each other so they could place bets on the fights. In fact, the evidence Plaintiff does produce is to the contrary. Plaintiff provides Moyle's responses to his requests for admission, where she denies that officers have bet on inmates. (ECF No. 163-2 at 203.) Walsh and Baca likewise deny knowledge of inmate fights in the culinary in NNCC in 2014 or 2015. (ECF Nos. 163-2 at 213, 232; 239-240.) Inmate King's declaration that he heard Gray tell Plaintiff that Mullins asked Gray to go after Plaintiff is inadmissible hearsay. Inmate Gurry states that he heard Mullins tell Plaintiff that he sometimes bets on who will win, but this does not demonstrate knowledge of such conduct by Cox, McDaniel, Foster, Baca, or Walsh. (ECF No. 163-2 at 57; Gurry Decl., ECF No. 107-1 at 10-11; ECF No. 163 at 237.)

1    At most, Plaintiff presents evidence that there were "rumors" that this was occurring, but

2   no actual proof that these Defendants had any knowledge this was actually happening.

3    Therefore, summary judgment should be granted in favor of Cox, McDaniel, Foster, Baca

4   and Walsh.

5   **C. First Amendment Right to Redress of Grievances-Keith, Carpenter, and Moyle**

6    **1. Standard**

7    "The First Amendment guarantees a prisoner a right to seek redress of grievances from

8   prison authorities and as well as a right of meaningful access to the courts." *Jones v. Williams*,

9   791 F.3d 1023, 1035 (9th Cir. 2015); *see also Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir.

10  2017) ("The most fundamental of the constitutional protections that prisoners retain are the First

11  Amendment rights to file prison grievances."); *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir.

12  2009) ("[P]risoners have a First Amendment right to file prison grievances."); *Rhodes v.*

13  *Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). Without the right to file grievances and pursue

14  litigation in the courts "inmates would be left with no viable mechanism to remedy prison

15  injustices." *Rhodes*, 408 F.3d at 567.

16    **2. Analysis**

17    According to Defendants, Plaintiff timely appealed his disciplinary determination

18  (ECF No. 151-3, 151-5); however, the grievance was mistakenly deactivated, but was eventually

19  decided by Warden Baca on June 24, 2019, and Plaintiff's subsequent second level grievance

20  was accepted. (ECF No. 151-6.)

21    Defendants argue that an inmate pursuing a claim for right to petition for redress of

22  grievances and access to the courts must allege that the deprivation injured his litigation efforts.

23  They assert that Plaintiff only asserts that their action frustrated his ability to file a timely appeal.

Carpenter provides a declaration that she did not participate in the grievance process. (Carpenter Decl., ECF No. 151-9.) In addition, the grievance and appeal, while significantly delayed, were eventually processed and decided. (Baca Decl., ECF No. 151-12.) The appeal was not dismissed as untimely.

The Defendants contend that insofar as Plaintiff's appeal was not properly tracked, he does not have a constitutionally protected right to have his appeal accepted or processed, citing *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003).

According to Plaintiff, on January 13, 2015, he saw Rexwinkel, Keith and Spinelli (not a defendant) for administrative segregation classification. On January 16, 2015, he sent a kite to Rexwinkel asking for the administrative segregation appeal forms, grievance forms, and clarification. On January 19, 2015, he filed a grievance regarding Mullins looking at him before the altercation took place. On January 20, 2015, he was given a first level grievance form to appeal his administrative segregation classification to the warden. He claims that sometime between January 19, 2015 and January 23, 2015, Rexwinkel stuffed the kite he sent her on January 16, into the side of his door, and yelled at him that he better quit sending kites and grievances about these issues if he knew what was good for him, and that if he did not stop he would be transferred out of NNCC for good. (Brand Aff., ECF No. 163-2 at 23-24.) He sent a kite to Moyle about Rexwinkel on January 25, 2015. He also sent a kite to Keith about Rexwinkel's interference, but got no response. So then he filed grievance 20062994978 on February 14, 2015. He got a response from Delporto (not a defendant) on February 19, 2015, stating that it was assigned for investigation. On March 31, 2015, he was found guilty at the disciplinary hearing. On March 31, 2015, Brannon gave him a first level grievance to appeal the disciplinary determination to the warden.

On March 31, 2015, Plaintiff filed his disciplinary appeal, on grievance 20092997903. He then received the disciplinary appeal returned with DOC form 2098 that said he needed to attach his paperwork. He claims he had already attached the original paperwork. On April 2, 2015, he was transferred to LCC. On May 6, 2015, he re-filed his disciplinary appeal on the LCC disciplinary appeal form and attached all paperwork and the original appeal form. He asserts that it was assigned to Rexwinkel. He did not get a response. (Brand Aff., ECF No. 163-2 at 25, 35-36.)

The evidence submitted by the parties on this issue reflects the following:

The culinary incident occurred on January 10, 2015. A notice of charges was issued against Plaintiff on the same date for assault, battery and mayhem. (ECF No. 151-1 at 2; ECF No. 163-1 at 35-36.)

Plaintiff subsequently had a classification/due process hearing before Rexwinkel. The case notes submitted by Plaintiff are difficult to read, but it appears it was held on January 18, 2015, but possibly it says January 16. (ECF No. 163-1 at 92.)

Plaintiff sent a kite to Rexwinkel on January 16, 2015, stating he was waiting for the form for his administrative segregation classification appeal, and asked how to proceed. (ECF No. 163-2 at 39.)

On January 25, 2015, he sent a kite to Moyle, stating that Rexwinkel was not doing her job and was not processing the appeals. (ECF No. 163-2 at 47.)

He sent a kite to Keith on February 1, 2015, stating that he was trying to appeal his administrative segregation hearing and asked to be sent the right forms. (ECF No. 163-2 at 49.)

Plaintiff apparently got a grievance form because on February 14, 2015, he submitted an informal level grievance, number 20062994978, about the culinary incident, claiming he was not

the aggressor. He stated that on January 12 or 13, his administrative segregation classification was held in Rexwinkel's office. Keith was also present. Plaintiff told Rexwinkel his version of what happened in the culinary. He says that Rexwinkel said she did not want to put anything about inmate Gray's threats to rape Plaintiff in the computer, and Keith was a witness. He asserted that they failed to file a PREA report (a claim which by itself was dismissed from this action). He went on to assert that no staff would provide him an administrative claim form. He asked for a finding that he was not the aggressor, and to have the notice of charges brought against him dismissed. (ECF No. 163-1 at 1-5, 52.)

The informal level grievance was assigned to H. Skulstad, and a response dated February 17, 2015, states that the grievance was forwarded to the Inspector General's office for further review. (ECF No. 163-1 at 6.)

Plaintiff submitted a first level grievance dated March 7, 2015. He again asserted that inmate Gray was the aggressor and had entered a guilty plea to the charge of assault in his disciplinary hearing. He said during his hearing the lieutenant said he knew Plaintiff was telling the truth and that the PREA report was not in the computer. He surmised that it was included in the computer after he filed his informal level grievance. He again asked for the notice of charges against him to be dismissed. He said that while the grievance had been referred to the Inspector General's office, as of March 7, 2015, no one had interviewed Plaintiff. (ECF No. 163-1 at 9-13.)

The first level grievance was assigned to Baca, who responded that Plaintiff received a correct response at the informal level, as the grievance had been referred to the Inspector General's Office for further review. (ECF No. 163-1 at 8.)

On April 16, 2016, Plaintiff submitted a second level grievance, stating that the only response he ever received from anyone was that his grievance has been referred to the Inspector

General's office. He questioned why his disciplinary hearing was held on March 31, 2015, if the Inspector General's Office was investigating the matter, and he was found guilty of battery and sanctioned to nine months in disciplinary segregation at LCC. He reiterated that as of April 16, 2015, no one had interviewed him as part of the investigation. He asked for the notice of charges to be removed from his file and to settle his claim for one million dollars. (ECF No. 163-1 at 18-24.)

The second level grievance was assigned to Foster, who responded on June 19, 2015, that the grievance was being investigated by the Inspector General's Office. (ECF No. 163-1 at 17.)

There is a document from NNCC's grievance coordinator to LCC's grievance coordinator dated August 5, 2015, forwarding grievance 20062994978, which appears to forward on to Plaintiff the grievance documentation for this grievance. (ECF No. 163-1 at 55-61.)

In the interim, on March 31, 2015, Plaintiff's disciplinary hearing was held and he was found guilty of battery and sentenced to nine months of disciplinary segregation. (ECF No. 151-4; ECF No. 163-1 at 37-40.)

Also on March 31, 2015, Plaintiff submitted a first level grievance form, assigned number 20062997903, which he also labeled as his "first appeal," presumably referring to his first level disciplinary appeal. He asked that they review the audio recording from the hearing and statement by Lieutenant Brannon that Plaintiff was telling the truth and was not the aggressor and was acting in self-defense. He asked for the guilty finding to be reversed. (ECF No. 151-5 at 2; ECF No. 163-1 at 30.) This is stamped as received April 1, 2015, by NNCC, by LCC on May 7, 2015, and by HDSP on May 13, 2015. (*Id.*; *see also* ECF No. 149-1 at 36.) Plaintiff was transferred to LCC on April 2, 2015.

There is an improper grievance memorandum for this grievance from Lisa Walsh, dated April 14, 2015, stating that the grievance was rejected because Plaintiff is required to attach all information and paperwork required for a disciplinary appeal, but he could resubmit his grievance after correcting the deficiency. (ECF No. 163-1 at 31.) Plaintiff signed the form on May 4, 2015. (*Id.*)

The inmate grievance history form for grievance 2006299703 first has an official response states: "LCC mailed L1 for response to NNCC on 5/7/15." There is also an indication that the level 1 grievance for 20062997903 was assigned to Rexwinkel, with a return date of April 14, 2015. The official response portion form then states:

> NNCC recvd grievance and signed RJD_1 from HDSP on 9/9/15, grievance is unsigned.
>
> NNCC to LCC 5/12/15
>
> LCC mailed signed RJD_1 to NNCC on 5/5/15, cg
>
> I/M signed RJD_1 on 5/4/15.
>
> NNCC to HDSP 4/24/15.
>
> 3098-grievance rejected. Per AR 740 you must attach all information and paperwork required for a disciplinary appeal.

(ECF No. 163-1 at 42.)

There is a memorandum from Coralee Gorsline to NNCC's grievance coordinator dated May 7, 2015, forwarding grievance 2006-29-97903 and the LCC disciplinary appeal form Plaintiff filled out to NNCC as the incident did not occur there. (ECF No. 163-1 at 65-88.)

There is a memorandum dated August 23, 2015, from Jerry Howell, Associate Warden at HDSP, to NNCC's grievance coordinator forwarding grievance 20062997903, stating that this was found in the file and HDSP was not involved. (ECF No. 163-1 at 63.)

It is unclear what happened to this grievance/level 1 disciplinary appeal, or why it was ever sent to HDSP, but it was eventually rejected as improper by Walsh, and Plaintiff signed the improper grievance memorandum on May 4, 2015.

On May 6, 2015, Plaintiff submitted another disciplinary appeal on LCC's disciplinary appeal form asking for a reversal of the guilty finding or a reduction to fighting with a verbal reprimand and suspension of the rest of his disciplinary segregation time. (ECF No. 163-1 at 32-34; ECF No. 151-5.) It is stamped as received by LCC on May 7, 2015. (*Id.*) It appears to include the disciplinary notice of charges (*id.* at 35-6), summary of disciplinary hearing (*id.* at 37-40), and Walsh's improper grievance memorandum (*id.* at 41).

It is unclear what happened with this disciplinary appeal form after this, but it was not acted on. In the course of this litigation, Plaintiff brought a motion for sanctions against defendants (ECF No. 126), and the court held a hearing on June 12, 2019. The issue of resolution of the disciplinary appeal came up at the hearing, and the court ordered Defendants to investigate and file a status report regarding this issue. (ECF No. 139.) According to Defendants, at some point the grievance was "deactivated" by Rexwinkel, who has since passed away, so it is impossible to determine the rationale for deactivation of the appeal. Defense counsel spoke to the warden at NNCC who indicated that the appeal would be reactivated and a response would be issued to Plaintiff. (*See* ECF Nos. 142, 142-1 to 142-5.)

Plaintiff filed a response to the status report, arguing that the result of all this was that his rights were violated for four years. He contends that all responses or rejections, which he contends would include deactivation, must be reviewed by the associate warden, which was Walsh. As such, he argued that Rexwinkel would not have been able to deactivate his disciplinary appeal without Walsh knowing about it. (ECF No. 143.)

Since filing the report, NDOC, through Baca, responded to the grievance on June 24, 2019. Baca found that while Plaintiff initially walked away from Gray, he then turned to face Gray, picked up a vegetable cutter, and used it as a weapon against Gray. As a result, Baca upheld the guilty finding. (ECF No. 149-1 at 34.) Plaintiff filed a new grievance. (ECF Nos. 149, 149-1.) Plaintiff also filed his second level appeal with supporting evidence on July 23, 2019. (ECF No. 149-1 at 2-33.)  Plaintiff indicates that his second level of the disciplinary appeal was reviewed and responded to on August 6, 2019.

Preliminarily, the court reiterates that the only defendants currently named in this claim are Keith, Moyle and Carpenter. Rexwinkel has been dismissed.

Next, Plaintiff's claim is that he was denied the right to seek redress of grievances. He presents evidence and argument regarding his ability to file a grievance on the issue, and his ability to file an appeal. Defendants conflate the requirements of an access to courts claim with a stand-alone First Amendment right to seek redress of grievances claim. Nevertheless, the evidence presented demonstrates that Keith, Moyle, and Carpenter did not violate his First Amendment right to seek redress of grievances.

Plaintiff presents evidence that Rexwinkel would not give him the correct forms, but then shortly thereafter, he filed grievance20062994978. There is no evidence that Keith, Moyle, or Carpenter frustrated his right to seek redress of grievances up to this point.

Plaintiff then argues that Defendants frustrated his right to proceed with his disciplinary appeal. The court previously advised Plaintiff that his claim regarding processing of his disciplinary appeal was dismissed on screening and he did not object to that order; therefore, it is not part of this case. In any event, there is no evidence that these defendants—Keith, Moyle and Carpenter—had anything to do with processing his disciplinary appeal.

He argues that Rexwinkel entered his disciplinary appeal into NOTIS on April 3, 2014, and then deactivated it to interfere with the grievance process "perhaps on the instruction of Walsh or Moyle." First, he provides no evidence of Moyle's involvement. In fact, Plaintiff submits Moyle's responses to interrogatories, and she clearly states that she had no involvement in the disciplinary appeal. (ECF No. 163-3 at 19.) Second, Walsh is not named a defendant in this claim, and even if she was, Plaintiff's statement that she should have known about the deactivation of the appeal does not amount to evidence that she did know about the deactivation.

Therefore, summary judgment should be granted in favor of Moyle, Keith and Carpenter with respect to the First Amendment right to seek redress of grievances claim.

## D. Retaliation-Keith

### 1. Standard

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of five elements:

> (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.

*Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005))

"The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities as well as a right of meaningful access to the courts." *Id.* (citing *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

### 2. Analysis

Plaintiff was transferred to LCC on April 2, 2015. (ECF No. 151-7.)

1    Plaintiff alleges that Keith told him that if he did not stop filing grievances he would be

2    kept in the "hole" and transferred, but according to Keith, Plaintiff was transferred from NNCC

3    to LCC after he was placed in disciplinary segregation because segregation beds are limited at

4    NNCC and most inmates who are given in excess of 30 days in segregation and transferred to

5    another institution. In addition, Keith asserts that Plaintiff's ability to file grievances has not been

6    hindered as he has continued to do so. (Keith Decl., ECF No. 151-10; grievance history at ECF

7    No. 151-11.)

8    Plaintiff provides Keith's responses to discovery which actually corroborate what Keith

9    states in his declaration. (ECF No. 163-2 at 185-86, 295, ECF No. 163-3 at 6.)

10    Plaintiff presents a kite he sent to Moyle on January 25, 2015, stating that Rexwinkel was

11    not doing her job and was not processing the appeals, and that Rexwinkel threatened him with

12    transfer if he did not keep the culinary complaints about watching the fight and keeping a

13    recording of it. (ECF No. 163-2 at 47.)

14    Plaintiff also presents a kite that he sent to Keith on February 1, 2015, stating that he was

15    trying to appeal his administrative segregation hearing, and now was being threatened with a

16    transfer for filing grievances. He asked Keith to send the right forms. (ECF No. 163-2 at 49.)

17    Plaintiff also points to an affidavit where he states that Rexwinkel told him that he better

18    quit sending kites and grievances about these issues if he knew what was good for him, and if he

19    did not stop he would be transferred out of NNCC. (Brand Decl., ECF No. 107-1 at 25.)

20    Plaintiff's evidence might raise a genuine dispute of material fact as to whether *Rexwinkel*

21    was retaliating against him by transferring him to LCC for filing kites and grievances; however,

22    Rexwinkel has been dismissed from this action. Plaintiff presents no evidence to create a genuine

23

1 | dispute of material fact that *Keith* retaliated against him. He presents his suspicion that Keith was

2 | acting along with Rexwinkel, but provides no corroborating evidence to support his position.

3 |      Plaintiff also argues that other inmates with administrative segregation in excessive of six

4 | months were not transferred from NNCC; however, he presents no evidence to support this

5 | assertion.

6 |      Therefore, summary judgment should be granted in favor of Keith as to the retaliation

7 | claim.

8 | **E. Qualified Immunity**

9 |      The only defendant for which the court must address the qualified immunity argument is

10 | Mullins.

11 |      The qualified immunity analysis consists of two steps: (1) viewing the facts in the light

12 | most favorable to the plaintiff, did the defendant violate the plaintiff's rights; and (2) was the

13 | right clearly established at the time the defendant acted. *See Castro v. County of Los Angeles*,

14 | 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc), *cert. denied*, 137 S.Ct. 831 (Jan. 23, 2017). ; *see*

15 | *also Hines v. Youseff*, (9th Cir Feb 1, 2019).

16 |      Here, it was clearly established in 2015 that "prison officials have a duty...to protect

17 | prisoners from violence at the hands of other prisoners", and that if a prison official knows of a

18 | sufficiently serious risk to an inmate's safety and disregards that risk, then he violates the Eighth

19 | Amendment. *Farmer*, 511 U.S. at 833, 837 (citations and quotations omitted). Thus, Mullins

20 | would have been on notice in 2015 that if he knew of a physical altercation occurring between

21 | inmates and failed to intervene, he would be subject to liability under the Eighth Amendment.

22 |

23 |

Moreover, viewing the facts in the light most favorable to Plaintiff, Mullins heard and/or saw the confrontation between Plaintiff and inmate Gray and failed to intervene, which would violate the Eighth Amendment.

Therefore, defendant Mullins is not entitled to qualified immunity.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING IN PART AND DENYING IN PART THE MOTION FOR SUMMARY JUDGMENT** as follows:

(1) the motion should be **DENIED** as to the Eighth Amendment failure to protect claim against Mullins; and

(2) the motion should be **GRANTED** as to the remaining claims and Defendants.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: June 4, 2020

William G. Cobb
United States Magistrate Judge

29